# Third District Court of Appeal

## State of Florida

Opinion filed March 25, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-1957
Lower Tribunal No. F19-6088C

_____

**Kamari Lowery,**
Appellant,

vs.

**State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Richard Hersch, Judge.

Carlos J. Martinez, Public Defender, and Shannon Hemmendinger, Assistant Public Defender, for appellant.

James Uthmeier, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.

Before LINDSEY, GORDO and GOODEN, JJ.

PER CURIAM.

Appellant Kamari Lowery appeals his conviction of manslaughter, robbery with a weapon, and armed burglary with assault, and his resulting sentence. On appeal, he asserts the "trial court erred by instating, over objection, a randomized method of jury selection that deprived counsel of making informed, meaningful, and strategic decisions about which jurors to peremptorily strike."

But Lowery did not properly preserve his challenge for appeal. As our Court recently stated in Sikes,

> To preserve for appellate review a challenge to the trial court's jury selection method as it pertains to the use of peremptory challenges, a party must do more than, as Sikes did here, simply object to the procedure that was used to select the jury. The party must (i) exhaust his or her peremptory challenges, (ii) identify an objectional juror that is still on the jury panel, (iii) request and be denied an additional peremptory challenge as to the objectionable juror, and (iv) prior to the jury panel being sworn, object to the composition of the jury.

Sikes v. R.J. Reynolds Tobacco Co., 415 So. 3d 235, 237 (Fla. 3d DCA 2025). See also Ter Keurst v. Miami Elevator Co., 486 So. 2d 547, 548–50 (Fla. 1986) ("The Ter Keursts' counsel objected to the system directed by the judge and urged that he should not have to exercise his challenges in this manner . . . . He did not, however, object to the jury ultimately sworn or indicate any desire to challenge any of those persons remaining. Moreover, he neither urged nor suggested that different people would have been

2

peremptorily challenged if a different system had been utilized. . . . The Ter Keursts' counsel did not object to the jury as finally composed; he evidenced no dissatisfaction with the jurors who sat, even though obviously dissatisfied with the method of selection. We do not find this case to present fundamental error and, therefore, hold that the contemporaneous objection rule applies. The Ter Keursts would have had to object to the jury as finally composed to prevail on appeal."); Aquila v. Brisk Transp., L.P., 170 So. 3d 924, 926 (Fla. 4th DCA 2015); Santa Fe Dev. Corp. v. Randolph, 506 So. 2d 18, 18 (Fla. 3d DCA 1987); Harris v. State, 349 So. 2d 854, 856 (Fla. 2d DCA 1977). While he objected to the method of jury selection, he did not take additional steps.[1] And so, we are constrained to affirm.

Affirmed.

LINDSEY and GOODEN, JJ., concur.

---

[1] Sikes and Lowery took the same approach—initially objecting to the method and then renewing their objection to that method at the conclusion of jury selection. Sikes, 415 So. 3d at 237. Cf. Paul v. State, 407 So. 3d 468, 476 (Fla. 4th DCA 2025), review granted, No. SC2025-0478, 2025 WL 1672365 (Fla. June 13, 2025) (outlining how Paul performed additional steps to preserve the challenge to the random-box method of jury selection).

GORDO, J., concurring in result.

While I agree with the majority that this case should be affirmed in all respects, I write separately to address the issues raised by the appellant.

**I.**

Kamari Lowery was indicted for first-degree murder, armed robbery and armed burglary of an occupied conveyance with assault or battery. He drove with his brother, Kenyota Lowery, and his brother's girlfriend, Aldana Mesias, to purchase marijuana from two individuals, Jonathan Escobar and Mariano Marin. After Escobar and Marin arrived at the scene, the brothers approached their vehicle on foot and, at gunpoint, demanded "anything" inside. Mesias remained in the car and witnessed the incident.

After handing over the marijuana, Escobar attempted to leave, but before he could do so, Kenyota—still pointing the firearm—demanded that Escobar surrender his chain. Escobar refused and told him, "Shoot me." As Escobar again attempted to leave, the brothers fired four to six shots in his direction, striking him in the head, right eye, and left thigh. Escobar died at the scene, while Marin was unharmed. The brothers fled to their car and Mesias drove them away. All three were arrested shortly thereafter.

The case proceeded to a joint trial.[1]  During jury selection, the parties were given time to fully question the entire venire.  They resolved all for-cause challenges by agreement, leaving fifty-one prospective jurors.  Before peremptory challenges began, the court announced it would use a "Google random number generator" to call the remaining jurors in random order rather than sequentially.  The court explained the parties would not know which juror numbers would be called until announced.  No juror numbers were changed and both sides knew which jurors were still available for challenge.

Defense counsel objected to the court's procedure, arguing he "would like to see what jurors are still available."  The trial court overruled the objection, noting the parties had seating charts and therefore knew which jurors remained available.  Counsel responded he saw no reason why the parties should be blind to the order of the remaining jurors.  The court noted the objection and proceeded with the jury selection, allotting each side with ten peremptory challenges.[2]

---

[1]  The State charged Kenyota with the same charges as Kamari.  Mesias was indicted as an accessory after the fact and subsequently entered into a plea agreement in exchange for her testimony against the brothers.

[2]  Under section 913.08(1)(a), Florida Statutes, both the state and the defendant are entitled to ten peremptory challenges when the charged offense is punishable by death or life imprisonment.  See § 913.08(1)(a), Fla. Stat.

After considering thirty-six jurors, the parties selected a twelve-member panel.[3]  Once Kamari's counsel exhausted his peremptory challenges, the trial court asked if he wished to raise any for-cause challenges.  Counsel did not raise any for-cause challenges, made no request for additional peremptories, identified no objectionable juror and accepted the panel.

The court then proceeded to select two alternates, allowing each side two additional strikes.  The parties considered five prospective jurors, selected two alternates and accepted both without objection.[4]  Before the panel was sworn, Kamari's counsel informed the trial court that he was renewing "all previous motions and objections" and accepted "the panel only subject to all previous renewals."  Counsel did not express any dissatisfaction with the jury panel or request additional peremptory challenges.  Upon the conclusion of jury selection, the trial court asked both defendants whether they were satisfied with their lawyers' services up to that point and both responded, "Yes, sir."

---

[3]  The court discussed the prospective jurors with the parties in the following randomized order: 34, 50, 46, 53, 79, 16, 62, 44, 72, 33, 12, 22, 47, 24, 59, 55, 42, 17, 29, 77, 43, 36, 13, 41, 69, 8, 39, 9, 2, 25, 48, 15, 27, 32, 6 and 64.

[4]  In total, the parties considered forty-one jurors to select a twelve-member panel and two alternates.

Following a four-day trial, the jury found Kamari guilty of manslaughter—a lesser-included offense of first-degree murder—armed robbery and armed burglary of an occupied conveyance with assault or battery.[5]  Kamari subsequently moved for a new trial, arguing he was "prejudiced in not being able to make strikes with full knowledge of order of the remaining prospective members of the jury panel."  The trial court denied the motion.  Kamari was sentenced to 20 years for manslaughter and 30 years for robbery and burglary, followed by 20 years of probation, with a 10-year mandatory minimum.  This appeal followed.

## II.

A trial court's "jury selection procedure" is reviewed for an abuse of discretion.  Rock v. State, 638 So. 2d 933, 934 (Fla. 1994).  "[W]hether an issue is properly preserved for appellate review is a question of law that this Court reviews de novo."  Wong v. State, 212 So. 3d 351, 355–56 (Fla. 2017).

## III.

This case involves two distinct objections to the trial court's method of jury selection, both of which are intertwined and addressed in the arguments before us.  Kamari argues, during the jury selection, he first lodged a

---

[5] Kenyota was convicted on all indicted charges and has appealed both his conviction and sentence in a related proceeding.  See Kenyota Lowery v. State of Florida, No. 3D23-2017.

7

challenge to the trial court's use of a random jury-box method[6] and later complained about the exercise of peremptory strikes. In my view, the objection to the jury selection method is properly preserved for appellate review, whereas the claim regarding the exercise of peremptory strikes is not.[7]

## IV.

At the outset, the manner in which peremptory challenges are exercised during jury selection lies within the sound discretion of the trial court. See Rock, 638 So. 2d at 934. While I agree with the majority's

---

[6]  The "random jury-box method" is a system of jury selection in which prospective jurors are selected by lot from the venire and placed into the jury-box, typically twelve at a time in a criminal case. Counsel for both sides then alternately exercise challenges for cause and peremptory challenges against those seated, with new jurors randomly drawn to replace any who are removed. This process continues in structured rounds until each side has either used or waived its allotted challenges, at which point the twelve individuals remaining in the box become the petit jury. This system focuses on evaluating jurors individually as they are seated and does not permit full advance knowledge of replacement jurors. See United States v. Blouin, 666 F.2d 796 (2d Cir. 1981).

[7]  This case presents two fundamentally different issues. The first is an objection to the method of jury selection itself, independent of any effect on peremptory strikes, which requires determining whether the court abused its discretion in employing that method. See Rock, 638 So. 2d 933 (Fla. 1994). The second is whether the jury selection method interfered with the exercise of peremptory strikes, which requires examining whether counsel was able to exercise those strikes in an informed, effective and strategically sound manner. See Ter Keurst v. Miami Elevator Co., 486 So. 2d 547 (Fla. 1986); Sikes v. R.J. Reynolds Tobacco Co., 415 So. 3d 235 (Fla. 3d DCA 2025).

8

ultimate conclusion, I would frame the initial inquiry by examining whether

the trial court in this case abused its discretion by employing the random jury-

box method that did not allow the parties to know in which order the

remaining jurors would be subject to peremptory challenge.[8]  In doing so, I

would begin by considering whether any constitutional provision, statute,

rule, binding case law, or historical tradition prohibits Florida courts from

employing the random jury-box method used in this case.[9]

---

[8]  Kamari initially objected to the lack of knowledge regarding the order in which jurors remained available for challenge and renewed all prior objections before the jury was sworn.  This issue is analogous to the preservation posture recognized in longstanding Florida Supreme Court precedent.  See Rock, 638 So. 2d at 934–35 (Fla. 1994) (finding that a contemporaneous objection to the trial court's method of jury selection was sufficient to preserve the issue for consideration on the merits).  Notably, this issue is materially different from the one we addressed in Sikes, 415 So. 3d 235.  There, we considered whether the jury-selection procedure impaired counsel's ability to exercise peremptory strikes.  Sikes did not involve a challenge directed solely to the method of jury selection itself, as addressed in Rock.  Here, Kamari presented a separate challenge to the trial court's use of the random jury-box procedure, independent of its effect on peremptory challenges.  That argument concerns whether the procedure— by not allowing the parties to know the order in which the remaining jurors would be seated—constitutes an abuse of discretion.  Sikes did not address that question.  Rather, our review there was limited to whether the procedure interfered with counsel's effective use of peremptory strikes.

[9]  Kamari asserts he would have preferred the "struck jury" system, an alternative method of jury selection in which an initial panel is drawn by lot from the pool of qualified venire members.  The size of this panel equals the number of jurors needed to decide the case—typically twelve in a criminal trial—plus the total number of peremptory challenges allotted to both sides.  Counsel then alternately exercise their peremptory challenges against this larger panel until each side has exhausted its allotted strikes, leaving the

9

## A.

Under the Florida Constitution, peremptory strikes are not recognized as a freestanding constitutional right. Article I, section 16(a) of the Florida Constitution guarantees criminal defendants the right to a speedy and public trial by an "impartial jury." Art. I, § 16(a), Fla. Const. The constitutional command is impartiality; it does not prescribe the mechanics of jury selection. The impartial-jury guarantee under the Florida Constitution does not grant a defendant a right to a particular type of selection or preferred jury composition; it guarantees fairness, not customization. See West v. State, 584 So. 2d 1044, 1045 (Fla. 1st DCA 1991) ("[A defendant's right to an impartial jury] does not entitle that defendant to be tried by any particular jurors or by a jury of a particular composition.").

Consistent with that principle, Florida law has long recognized that peremptory challenges are very important tools in the process of seating an impartial jury. They themselves, however, are not the constitutional guarantee. As the Florida Supreme Court has explained, while cause challenges and peremptory strikes are the primary mechanisms by which an impartial jury is selected, peremptories occupy a fundamentally different

---

remaining twelve individuals to serve as the petit jury. Unlike the random jury-box system, the struck jury system usually permits full advance knowledge of replacement jurors in sequence. See Blouin, 666 F.2d 796.

10

status: they are not constitutional entitlements but procedural tools designed to facilitate the selection of a fair and impartial jury.  See State v. Neil, 457 So. 2d 481, 486 (Fla. 1984), receded from on other grounds by State v. Johans, 613 So. 2d 1319, 1321 (Fla. 1993) ("The primary purpose of peremptory challenges is to aid and assist in the selection of an impartial jury."); State v. Alen, 616 So. 2d 452, 453 (Fla. 1993) ("[T]he peremptory challenge contributes significantly to the selection of a fair jury[.]"); Busby v. State, 894 So. 2d 88, 102 (Fla. 2004) ("[T]he ability to exercise peremptory challenges as provided under Florida law is an essential component to achieving Florida's constitutional guaranty of trial by an impartial jury."); Hayes v. State, 94 So. 3d 452, 459 (Fla. 2012) ("While there is no freestanding constitutional right to exercise peremptory challenges . . . this Court has long recognized that 'such challenges are "nonetheless one of the most important of the rights secured to the accused."'" (quoting Smith v. State, 59 So. 3d 1107, 1111 (Fla. 2011))).

Our federal Constitution also guarantees a criminal defendant the right to a speedy and public trial by an "impartial jury."  U.S. Const. amend. VI.[10] That guarantee applies to state criminal prosecutions through the Fourteenth

---

[10]  The Florida Constitution contains language similar to that of the Federal Constitution.  See Art. I, § 16(a), Fla. Const.

11

Amendment's Due Process Clause, which commands that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Importantly, "the United States Constitution generally sets the 'floor'—not the 'ceiling'—of personal rights and freedoms that must be afforded to a defendant by Florida law." State v. Horwitz, 191 So. 3d 429, 438 (Fla. 2016). Like Florida, the text of the federal Constitution confers no freestanding constitutional right to peremptory challenges. The Sixth and Fourteenth Amendments protect the right to an impartial jury that is ultimately seated—not the procedures or methods by which jurors are selected.

The United States Supreme Court has also consistently recognized that peremptory challenges are not constitutionally guaranteed but instead are a tool to help secure an impartial jury. And—so long as the jury ultimately seated is impartial—the proper regulation of use of a peremptory challenge does not constitute a Sixth Amendment violation. See Ross v. Oklahoma, 487 U.S. 81, 88 (1988) ("We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."); United States v.

Martinez-Salazar, 528 U.S. 304, 307 (2000) ("[Peremptories] are one means to achieve the constitutionally required end of an impartial jury.").

In sum, the Florida and U.S. Constitutions both safeguard the right to an impartial jury but neither create a freestanding right to a specific jury-selection method. See Amos v. Gunn, 94 So. 615, 648 (Fla. 1922) ("The intent of a constitution is shown by the words that are used therein. The courts have no power to add provisions to the Constitution.").

**B.**

Similarly, current Florida statutes and procedural rules confer no right to know, before exercising a peremptory challenge, which juror will replace a stricken panelist. Florida's modern jury-selection statutes and rules govern eligibility, venire creation and the number of peremptories but do not dictate the order by which replacement jurors must be called after a peremptory strike. See § 913.08, Fla. Stat.; Fla. R. Crim. P. 3.350. Section 913.08, Florida Statutes, establishes how many peremptory challenges each side receives. Rule 3.350, Florida Rules of Criminal Procedure likewise governs the number and allocation of peremptories, including alternates and discretionary additional strikes. No statute or procedural rule dictates replacement order or requires advanced knowledge of who comes next. See Fla. R. Crim. P. 3.350.

The federal scheme is governed by the federal jury-selection statute, 28 U.S.C. § 1866, which provides "the jury commission or the clerk shall draw at random from the qualified jury wheel such numbers of names of persons as may be required for assignment to grand and petit jury panels." 28 U.S.C. § 1866(a). That directive operates within the broader framework of 28 U.S.C. § 1863, which requires each district court to implement "a written plan for the random selection of grand and petit jurors" and to prescribe detailed procedures designed to ensure the random selection of a fair cross section of the community. 28 U.S.C. § 1863(a), (b)(3). These statutes regulate the mechanics of selecting a jury and do not mandate any fixed sequence for replacement jurors or require disclosure of who will be called next. Instead, they require that jurors be selected at random. The exercise of peremptory challenges, in turn, is governed by Rule 24, Federal Rules of Criminal Procedure. See Fed. R. Crim. P. 24. Rule 24 establishes the number of peremptory challenges and addresses their allocation but it sets forth no specific method for their exercise and does not mandate any particular order in which replacement jurors must be called. Section 1866 and Rule 24 embody a jury-selection framework intended to safeguard randomness and administrative discretion. No federal statute confers upon litigants a right to advance notice of who comes next.

14

The applicable Florida and federal statutes and rules governing jury selection regulate only the basic mechanics of the process and number of peremptory challenges. Neither explicitly recognizes a right to know the order in which the remaining jurors are subject to peremptory challenges.

**C.**

Our Florida Supreme Court's approved jury practices—dating back more than a century—likewise do not recognize a right to know who comes next. See Green v. State, 17 Fla. 669, 680–81 (1880). In Green, the Florida Supreme Court addressed and rejected the precise type of objection advanced here. There, the defendant argued it was error for the sheriff— after the regular panel was exhausted—to summon bystanders "one at a time" and without furnishing a full list in advance. Id. at 680. Relying on the applicable statute, Chapter 1628, Laws of 1868, section 21, the Court explained that when "by reason of challenge or otherwise" the panel is depleted, "the court shall cause jurors to be summoned from the by-standers" to complete the jury, and that the statute "does not contemplate the issuing of a special venire" or any formal return of names. Id. at 680-81. The entire proceeding, the Court emphasized, occurs in "open court" and is reflected in the "minutes." Id. at 681. The Court did not require advance disclosure of a defined replacement sequence. Id. This framework reflects judicial flexibility

15

and a randomized process for selecting replacement jurors—not a predetermined, preannounced sequence.

Green is fundamentally incompatible with the existence of any right to know "who comes next." If Florida law had ever recognized an entitlement to the order of replacement jurors, Green could not have approved a system in which bystanders were summoned individually, on demand, without a preannounced list. See Green, 17 Fla. at 680–81. This historical precedent belies the claim that replacement in jury selection may only properly occur through a fixed, party-known order disclosed before a peremptory strike.

Other Florida precedent from the turn of the twentieth century also confirms that random jury-box method is an appropriate method so long as a party suffers no prejudice in its application. See Colson v. State, 40 So. 183 (Fla. 1906). In Colson, the Florida Supreme Court upheld the trial court's authority, once the available venire proved insufficient "by reason of challenges or otherwise," to draw additional names from the jury-box or direct the sheriff to summon qualified jurors from the body of the county to complete the panel. Id. at 187. The governing statute, section 1158 of the Revised Statutes of 1892, expressly authorized the court, in its discretion, to "draw, or cause to be drawn from the box, to be summoned, or [] direct the sheriff

16

to summon from by-standers," a sufficient number of jurors to complete the jury. Id.

In particular, jurors were randomly selected or called one by one from the box. Equally significant, the Court rejected challenges premised on alleged irregularities in the drawing process absent a showing of prejudice, explaining that even where there has been a "substantial departure" from prescribed procedures, the objection "should not avail" if "no possible injury could accrue to the defendant." Id.

In Ammos v. State, the Florida Supreme Court again affirmed the longstanding presumption that jurors seated in the box are "fit and qualified generally for jury service," underscoring that peremptory challenges operate as a supplemental safeguard in securing an impartial jury. Ammons v. State, 61 So. 496, 497 (Fla. 1913). Taken together Ammons, Colson and Green substantiate that Florida's early jury selection practice did not contemplate—much less require—advance disclosure of a predetermined replacement juror. When the available panel proved insufficient, additional jurors were drawn or summoned as needed—subject to challenge—and absent prejudice, no irregularity warranted reversal.

Recently, our sister district court upheld the very jury-selection procedure challenged here. See Paul v. State, 407 So. 3d 468 (Fla. 4th DCA

17

2025). In Paul, the Fourth District reaffirmed that Florida law secures a defendant's right to an impartial jury and the ability to exercise peremptory challenges but does not guarantee knowledge of which juror will replace a stricken juror. Id. at 476. The Court held that the random "jury box" method is a traditional, constitutionally permissible means of conducting jury selection. Id. at 479.[11]

Federal case law has also overwhelmingly approved random jury-box method and rejected any purported right to know who comes next. See United States v. Blouin, 666 F.2d 796, 797 (2d Cir. 1981); United States v. Delgado, 350 F.3d 520, 524 (6th Cir. 2003); United States v. Williams, No. 21-10079, 2022 WL 402927, at *2 (11th Cir. Feb. 10, 2022).

In Blouin, the Second Circuit upheld a trial court's use of the "jury box" method, which required the defendant to exercise his final peremptory challenges without knowing which jurors would be called to replace those struck. Blouin, 666 F.2d at 796. Although the defendant argued such

---

[11] Paul is currently pending review before the Florida Supreme Court. The record in Paul is materially different than the one before us. Paul also addressed whether the randomized procedure prevented defense counsel from making informed, effective and strategically sound decisions when exercising peremptory challenges. That aspect of Paul is not evaluated here, as Kamari failed to preserve such an argument in this case. This discussion is confined to the narrow question of whether the jury selection method itself is permissible.

18

procedure limited his ability to make effective use of his peremptories, the court flatly disagreed, holding the jury-selection process "did not deny Blouin any protected right[.]" Id. The court explained this limitation is an inherent feature of the jury-box system, which—unlike the struck-jury method—does not permit "full comparative choice" because the parties do not know in advance who will replace a challenged juror. Id. at 798. The court rejected the premise that error can be shown merely by demonstrating that a different procedure would have allowed more "effective" use of peremptories, warning that if such a rule governed, the struck-jury system would be constitutionally required in every case. Id. at 798–99.

Comparably, in Delgado, the Sixth Circuit rejected a defendant's claim that the trial court's use of a struck-jury system as a jury-selection method impaired counsel's ability to exercise peremptory challenges. Delgado, 350 F.3d at 524. The court held the defendant's claim of inability to make effective use of his peremptories did "not invalidate" the trial court's chosen procedure "in which jurors were not seated in a sequence." Id. The court concluded that federal law does not mandate a preferred "method by which such challenges are to be exercised." Id. It specifically found the trial court's procedure was consistent with "the true nature of the peremptory challenge right which is to allow the rejection and not the selection of perspective

jurors." Id. at 525 (internal quotation marks and citation omitted) (cleaned up).

More recently, in Williams, the Eleventh Circuit upheld a trial court's jury selection method which required "the parties to exercise peremptory challenges without first having the opportunity to examine all prospective jurors." Williams, 2022 WL 402927, at *2. The court rejected the defendant's claim that the method employed by the trial court "impaired [counsel's] ability to exercise intelligently his peremptory challenges." Id. Williams, Delgado and Blouin confirm that peremptory challenges are intended to help secure an impartial jury, not to allow parties to shape the jury selection according to their preferred strategy.

## D.

It is also worth considering whether the history and tradition of common law discussions or statutory schemes in our early Republic have ever recognized a mandatory right to know in advance which qualified juror will be called to be considered to serve next.

Florida's early statutory practice employed random selection as the foundational mechanism for constituting juries—a method that necessarily carried forward into the replacement process once challenges were

20

exercised.  See Acts of the Legislative Council of the Territory of Fla., ch. 86, §§ 4, 7, at 134 (1832).

The Territorial Legislature required that the names of qualified jurors be written on slips of paper and placed in a box, from which the required number would be drawn in the presence of the marshal or sheriff.  See Acts of the Legislative Council of the Territory of Fla., ch. 86, § 4, at 134 (1832) ("Be it further enacted, That the clerks of the superior courts in the several counties in this Territory shall write the names of the persons returned to them as qualified to serve as jurors, which shall be written on slips of paper and placed in one box, from which, in the presence of the marshal or sheriff, shall be drawn forty-seven names; and the persons so drawn shall be summoned by the proper officer according to law.").

Those drawn were then summoned for service, and, upon assembly, their names were again placed into a box and drawn to compose the grand and petit juries.  See Acts of the Legislative Council of the Territory of Fla., ch. 86, § 7, at 134 (1832) ("Be it further enacted, That it shall be the duty of the marshal, as soon as the court is open, to call aloud at the door of the court house the whole of the jurors summoned to attend; and the names of all that are present shall be taken down by the clerk of the court, on slips of paper of equal size, and put into a hat or box, and the twenty three first drawn

21

shall compose the grand jury, and the balance remaining undrawn shall be the petit jury.").

Even where additional jurors were required, the statute directed that a venire facias issue and that the replacement jurors be "chosen as aforesaid"—that is, by the same randomized drawing process. See Acts of the Legislative Council of the Territory of Fla., ch. 86, § 7, at 134 (1832) ("That if there should be a failure to summon jurors, the court may direct a *venire facias*[12] to issue returnable immediately, and shall direct the summoning of forty-seven jurors, who shall be chosen as aforesaid, the first twenty-three selected to act as grand jurors, and the remainder as petit jurors.") (footnote added).

This statutory scheme leaves no room for a claimed entitlement to a fixed or party-known sequence of replacements. From initial qualification through final composition, jury formation depended upon chance selection administered by court officers—not upon a predetermined lineup disclosed to litigants in advance. At no point could the parties know, much less control, who ultimately would comprise the petit jury. Its membership emerged only

---

[12] Venire facias is "a judicial writ directing the sheriff to summon a specified number of qualified persons to serve as jurors." Meriam-Webster Online Dictionary (1828), https://www.merriam-webster.com/dictionary/venire%20facias (last visited Mar. 19, 2026).

through successive randomized draws. In that historical framework, peremptory challenges operated against jurors as they were drawn and presented, not against an anticipated and ordered succession of future replacements.

Florida's early jury selection practice notably included the use of "talesmen," or "bystanders," to complete a jury when necessary—a procedure that by its very nature forecloses any claimed entitlement to a fixed or knowable sequence of replacements. Green, 17 Fla. at 680; John Proffatt, A Treatise on Trial by Jury, Including Questions of Law and Fact 191 (1877). As stated above, Green holds that when the original jurors were exhausted due to challenges or other reasons, the court could promptly summon additional jurors from the bystanders or the county at large to complete the panel, without needing to issue "a special venire." Green, 17 Fla. at 680.

Proffatt observes that when summoned jurors failed to appear, or the panel was reduced by exemptions or challenges, the deficiency was "made up by summoning *so many* of the bystanders as will be necessary to complete the panel." Proffatt, supra at 191. This approach limited any party's ability to anticipate which jurors would serve next and reinforced the notion that early Florida practice valued completing the jury efficiently over

23

adhering to preferred procedural formalities. Thus, history and tradition confirm that random selection from the jury-box has been the governing norm—throughout Florida—since at least 1832.

From at least the seventeenth century forward, the dominant common-law model for ordinary juries was a "jury-box" style procedure in which names were drawn by lot, challenges were exercised against jurors under consideration and vacancies were filled by additional "random" draws from the remaining pool. See Giles Duncombe, Trials per Pais: Or, the Law of England Concerning Juries by Nisi Prius, & C. 157–58 (1665); Seymour D. Thompson & Edwin G. Merriam, A Treatise on the Organization, Custody and Conduct of Juries, Including Grand Juries 287 (1882). Under that model, a litigant could not claim any entitlement to know in advance which particular venire member would replace a juror removed by challenge because the replacement was selected "indifferently" (i.e., by lot) from the remaining panel. Duncombe, supra at 157–58; Thompson & Merriam, supra at 287. Any historical sources that do address replacement order treat randomness as a feature intended to prevent parties from manipulating the composition of the petit jury by anticipating substitutions. See Thompson & Merriam, supra at 287–88.

One of the earliest treatise descriptions of jury selection explains that prospective jurors' names were placed into a "box or glass" and drawn until the requisite number was obtained, with additional names drawn as needed when jurors were challenged or failed to appear. Duncombe, supra at 157-58. That description reflects a process where the identity of any replacement juror necessarily remained unknown to the litigants at the time they decided whether to challenge a juror then under consideration.

Nineteenth-century American sources describe the same basic approach as the typical method in many jurisdictions: names written on slips, placed in a box, twelve drawn to form the presumptive jury and additional names drawn to complete the panel as jurors were challenged or excused. See Thompson & Merriam, supra at 287. That "box" method, as described, is structurally incompatible with any right to know in advance who will replace a struck juror because the replacement is not selected until after the strike is made and is selected by lot. Id. Another treatise explains that when a juror was excused, the court could "fill the vacancy" by directing the clerk to draw another name from the box, again reflecting replacement by random selection rather than by a litigant-known sequence. W.W. Thornton, The Law Appertaining to Juries and Instructions Thereto: Applicable to Those States Having Codes Similar to the Indiana Code, the Instructions Being

Applicable to Any State, Having All Been Approved by the Supreme Court of Indiana 105 (1888).

South Carolina's early practice, as reflected in its courts, provides a clear illustration of historical jury formation and replacement. See State v. Sims, 18 S.C.L. 29, 32 (S.C. App. L. & Eq. 1830). In Sims, twelve names were drawn from a "box or glass" to form the jury and if a juror was challenged, "other persons" were drawn "out of the said box or glass to fill up and complete the said jury." Id. at 32. The court endorsed this method of summoning replacement jurors as necessary, noting that, taken together, the system was "better calculated to further the ends of justice, and to secure the trial by jury from fraud and corruption." Id. at 33. This principle mirrors the 1731 South Carolina Act, which directed that petit jurors be drawn from a separate box or glass and that replacements be drawn as necessary to complete the panel, rather than from any litigant-controlled or litigant-known order.

The historic case most directly on point, City Council of Charleston v. Kleinback, 29 S.C.L. 418, 423 (S.C. App. L. 1844), rejected the very idea Kamari advances here—challenging with an eye toward a particular substitute—holding the parties "should not be permitted to make their challenges with any view of looking to any particular juror in the

supernumerary list as a substitute." <u>Kleinback</u> further illustrated the rule by explaining that, even if names were initially in a known order, they must be "put in the hat and drawn over again," requiring the parties to "take them as they are thus drawn," which defeats any asserted entitlement to advance knowledge of the substitute. <u>Id.</u> The point of such randomization was not merely administrative convenience but also preventing "undue advantage" and avoiding temptations for "criminal understanding" by making it impossible to target a particular juror as the predictable replacement. <u>Id.</u>

Modern commentary likewise describes random replacement as the "usual system" in a jury-box approach, where a challenged juror is replaced by someone "selected randomly" from the remaining prospective jurors. Jon M. Van Dyke, <u>Jury Selection Procedures: Our Uncertain Commitment to Representative Panels</u> 146 (1977). Van Dyke explains that under this system, a litigant may perceive the replacement as less favorable than the juror just struck. <u>See Id.</u> ("Attorneys usually must exercise some restraint in exercising peremptory challenges and will only eliminate those persons who appear 'worse' than average. Under the usual system, a juror challenged peremptorily is replaced in the jury-box by someone selected randomly from among the remaining prospective jurors, and the new juror may be someone worse (from the perspective of the litigant exercising peremptory challenge)

27

than the person just challenged.  The new juror may also be challenged, if any challenges are left.").  This randomized approach is considered effective in creating a balance in jury selection, ensuring that peremptory challenges function as a safeguard against obviously unsuitable jurors while preventing strategic manipulation of the panel.

Historical authorities make it clear that where statutes are silent about the mode of impaneling, all subsequent proceedings in relation to the formation of a jury are left to the discretion of the court, which includes the order in which jurors are called and replaced.  See Thompson & Merriam, supra at 288 ("Where the statutes are silent as to the mode of impaneling the jury, after the jurors are returned into court, all subsequent proceedings in relation to the formation of a jury are left to the discretion of the court."); 1 Seymour D. Thompson, A Treatise on the Law of Trials in Actions Civil and Criminal 84 (1889) ("Within the scope of this discretion are such questions as the order in which the name of the jurors shall be called.").

The absence of any textual command in the common law or statutory scheme mandating a replacement order is faithful to history and tradition since the founding of our Republic.  The key takeaway is that trial judges maintain substantial latitude to select procedures tailored to local conditions and efficient jury management absent prejudicial error.

**E.**

Equally important is whether peremptory challenges themselves guarantee the right to select preferred jurors and whether a right requires advance knowledge of replacements.

Across the nineteenth century, leading commentators consistently described the peremptory strike as a mechanism for excluding objectionable jurors, not for choosing preferred ones. Seymour D. Thompson explained the "right of peremptory challenge is a right to reject and not a right to select." 1 Thompson, <u>supra</u> at 37. Hugo Hirsch echoed the same understanding in his treatise, stating the right to exercise a peremptory strike is "not to *select*, but to *reject*." Hugo Hirsch, <u>A Practical Treatise on Juries, Their Powers, Duties, and Uses, in All Actions and Proceedings, Both Civil and Criminal, Under the Common Law, and Under the Statutes of the United States and the State of New York</u> 141 (1879). In their treatise on the organization and conduct of juries, Seymour D. Thompson and Edwin G. Merriam emphasized the peremptory challenge "is a right only to reject, and can never be so exercised as to confer a right to select." Thompson & Merriam, <u>supra</u> at 286.

Centuries-old precedent from both Florida courts and the United States Supreme Court reinforces that same principle. In <u>Colson</u>, the Florida

29

Supreme Court characterized it as a "fundamental principle" that a "peremptory challenge is a right to reject, and not a right to select." Colson, 40 So. at 187. The Court reiterated that understanding in Melbourne v. State, explaining that a criminal defendant "has no right to any particular juror" and that the right of "challenge confers the right to reject, not to select, jurors." Melbourne v. State, 40 So. 189, 190 (Fla. 1906). More recently, in Hayes, the Court described the "central function of peremptory challenges is to enable each side to exclude those jurors it believes will be most partial toward the other side." Hayes, 94 So. 3d at 459 (internal quotation marks and citation omitted).

The United States Supreme Court has articulated the same rule for nearly two centuries. In United States v. Marchant, the Court made clear the "peremptory challenge is not of itself a right to select, but a right to reject jurors." United States v. Marchant, 25 U.S. 480, 482 (1827). That formulation was reaffirmed in Hayes v. Missouri and again in Brown v. New Jersey. See Hayes v. Missouri, 120 U.S. 68, 71 (1887) ("The right to challenge is the right to reject, not to select, a juror."); Brown v. New Jersey, 175 U.S. 172, 175 (1899) ("The right to challenge is the right to reject, not to select, a juror.") (citation omitted).

30

This understanding necessarily clarifies the role of peremptory challenges, whose central function under Florida law is not to permit jury construction but to allow each side to exclude jurors it believes may be partial, operating as a safeguard to achieve impartiality rather than as a substantive right to an engineered jury. See Hayes, 94 So. 3d at 460 ("Indeed, peremptory challenges, as well as challenges for cause, are the primary tools by which parties remove unfavorable jurors from the jury panel."); 33 Fla. Jur. 2d Juries § 78 ("No one is entitled to a particular juror or a jury of any particular composition. The right is not one of selection; it is to reject jurors who are biased, prejudiced, or otherwise incompetent.").

Taken together, this uninterrupted line of commentary and precedent refutes any claim that peremptories historically implied a right to advanced knowledge of replacement jurors.

**V.**

Because no constitutional provision, statute, rule, binding precedent or historical tradition prevents Florida courts from using the random jury-box method, the issue ultimately turns on whether the manner in which it was applied resulted in any prejudice to Kamari.

The Florida Supreme Court's jurisprudence has made clear that trial courts retain broad discretion over jury selection procedures, including the

31

manner in which peremptory challenges are exercised.  See Walsingham v. State, 56 So. 195, 198 (Fla. 1911) ("[A] trial court, in impaneling a jury to serve in a particular case, should have, and has, a very extensive and almost unlimited discretion . . . ." (quoting State v. Miller, 29 Kan. 43, 46 (1882))); Ter Keurst, 486 So. 2d at 549 ("[T]he procedure for jury selection has traditionally been a discretionary function of the trial judge."); Rock, 638 So. 2d at 934 ("The [] jury selection procedure used in Rock's case was a valid exercise of the trial court's discretion in promoting jury management and efficiency.").

Federal case law likewise holds that jury-selection procedures, including the manner in which peremptory challenges are exercised, are traditionally committed to the discretion of the trial courts.  See Blouin, 666 F.2d at 797 ("[T]rial courts retain a broad discretion to determine the way peremptory challenges will be exercised."); Delgado, 350 F.3d at 524 ("Jury selection procedures, including the manner in which peremptory challenges are exercised, are traditionally left to the discretion of the [trial] courts."); Williams, 2022 WL 402927, at *2 ("We review for abuse of discretion 'the procedure adopted by the trial court to regulate the parties' exercise of peremptory challenges.'  We have recognized that the 'trial court has wide discretion in supervising the selection of jurors and regulating the exercise

of peremptory challenges.'" (quoting United States v. Green, 981 F.3d 945, 958 (11th Cir. 2020))).

"While the time and manner of challenging and swearing jurors have traditionally rested within the sound discretion of the trial court, a trial court does not have the discretion to infringe upon a party's right to challenge any juror, either peremptorily or for cause, prior to the time the jury is sworn." Lottimer v. N. Broward Hosp. Dist., 889 So. 2d 165, 166–67 (Fla. 4th DCA 2004) (cleaned up). "The burden of showing that the trial judge abused his discretion lies with the defendant." Holmes v. State, 374 So. 2d 944, 949 (Fla. 1979). "A conviction or sentence may not be reversed absent an express finding that a prejudicial error occurred in the trial court." Cargle v. State, 770 So. 2d 1151, 1153 (Fla. 2000) (quoting § 924.051(7), Fla. Stat.). "In a direct appeal . . . the party challenging the judgment or order of the trial court has the burden of demonstrating that a prejudicial error occurred in the trial court." Id.

Our appellate review under an abuse of discretion standard requires more than disagreement with a trial court's chosen method; it requires a showing that the procedure meaningfully impaired the exercise of a protected right. See Lottimer, 889 So. 2d at 166–67. The critical inquiry therefore is not whether a different jury-selection process could have been

33

used but whether the process used here prejudiced Kamari in exercising his peremptory challenges in a manner guaranteed by Florida law. It did NOT.

The record shows that Kamari's counsel was actively, thoroughly and deliberately engaged throughout an extensive jury selection process. Counsel exercised all ten peremptory challenges in a measured and careful manner, including repeatedly reviewing a completed but untendered panel and employing additional strikes to refine its composition until he was fully satisfied. Counsel closely scrutinized the State's use of peremptory challenges, demanding race-neutral explanations on multiple occasions and successfully defeating at least one attempted strike, further reflecting vigilant advocacy. After Kamari's peremptory challenges were exhausted and the panel finalized, the trial court offered additional for-cause challenges, which counsel declined and counsel neither sought additional peremptory strikes nor suggested that his ability to exercise them had been restricted in any way. Counsel identified no objectionable juror who ultimately served on the panel.

The trial court did not prematurely swear the jury or limit the use of back strikes and all parties remained aware of the remaining juror pool as counsel repeatedly reviewed both the jury and alternates before accepting them. At no time did Kamari's counsel assert the court's random jury-box

method was prejudicial. Kamari raises no challenge to any juror who ultimately served on the panel and asserts no claim of juror partiality. Counsel was afforded—and fully exercised—a meaningful opportunity to use his peremptory challenges. Accordingly, on this record, Kamari has not carried his burden to demonstrate that the trial court's choice of using the random jury-box method was an abuse of discretion or that it resulted in prejudicial error.

## VI.

Kamari asserts his second issue—that the random jury-box method impaired counsel's ability to exercise peremptory challenges in an informed, effective and strategic manner—was properly preserved for appellate review.[13]

## A.

Our review of a pure question of law—such as whether an issue has been properly preserved—is de novo and we are not constrained by the parties' characterizations.[14] See Black v. Cohen, 246 So. 3d 379, 384 (Fla.

---

[13] This Court previously addressed this issue in Sikes, considering whether the random jury-box method impaired counsel's ability to exercise peremptory challenges. 415 So. 3d at 237. Because the issue was unpreserved, we did not reach the merits. Id.

[14] While the State conceded in its initial brief that this issue was properly preserved, it argued for the first time at oral argument that it was not. Parties are generally bound by the positions they take in their briefs. The

4th DCA 2018) ("The preservation of an objection is strictly a question of law and thus reviewable by the appellate court de novo."); Alvarez v. Smith, 714 So. 2d 652, 653 (Fla. 5th DCA 1998) ("The determination of legal questions is for the court rather than the parties."); Hous. Opportunities Project v. SPV Realty, LC, 212 So. 3d 419, 426 (Fla. 3d DCA 2016) ("Our task is to decide the legal issue before us."); Citizens of State through Fla. Off. of Pub. Couns. v. Fla. Pub. Serv. Comm'n, 294 So. 3d 961, 965 (Fla. 1st DCA 2019) ("[I]t is our responsibility to say what the applicable law is.").

**B.**

Our decades-long Florida Supreme Court precedent holds that a challenge to the exercise of "peremptories cannot be examined until the issue is properly presented to the trial court[.]" Neil, 457 So. 2d at 488 (Fla. 1984). "In order to preserve a challenge to a peremptory strike for appellate

---

determination of legal questions, however—including preservation—rests with us. The parties cannot by stipulation or concession control our resolution of such issues. See Clark v. Munroe, 407 So. 2d 1036, 1037 (Fla. 1st DCA 1981) ("The parties cannot by stipulation control questions of law."); Sigismondi v. State, 380 So. 3d 1208, 1218 n.1 (Fla. 2d DCA 2024) ("[E]ven where 'the State has not argued the lack of preservation in an appeal[,] this court has an independent obligation to ensure that an alleged prejudicial error was properly preserved for appellate review.' Consequently, 'while this independent obligation does not excuse parties from raising on appeal the issue of whether an alleged error is properly preserved, we will not base a reversal on an unpreserved error simply because the opposing party failed to bring the lack of preservation to our attention.'" (quoting Conner v. State, 987 So. 2d 130, 132 n.2 (Fla. 2d DCA 2008))).

review, the objecting party must notice the trial court of the basis for the objection." John v. State, 741 So. 2d 550, 551 (Fla. 4th DCA 1999) (citing Melbourne v. State, 679 So. 2d 759, 764 (Fla. 1996)). A party's challenge to the exercise of "peremptories must be raised prior to the jury being sworn." State v. Castillo, 486 So. 2d 565, 565 (Fla. 1986).

Florida law is well-settled "that proper preservation entails three components." Calloway v. State, 210 So. 3d 1160, 1191 (Fla. 2017) (quoting Harrell v. State, 894 So. 2d 935, 940 (Fla. 2005)). "First, a litigant must make a timely, contemporaneous objection." Id. "Second, the party must state a legal ground for that objection." Id. "Third, in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection below." Id. (emphasis omitted).

We have repeatedly held that to satisfy this third requirement "'a defendant must state distinctly the matter to which he objects and the grounds of his objection' to preserve his objection for appellate review." Connolly v. State, 172 So. 3d 893, 903 (Fla. 3d DCA 2015) (quoting Courson v. State, 414 So. 2d 207, 209 (Fla. 3d DCA 1982)). This premise is critical because the Florida Supreme Court has made clear that general objections are insufficient to preserve an issue for appellate review with respect to peremptory strikes. See State v. Pacchiana, 289 So. 3d 857, 862 (Fla.

37

2020). Instead, a litigant must assert a "clear and specific [] objection" as required by law. Id. "The purpose for the rule is to 'place the trial judge on notice that error may have been committed, and provide him an opportunity to correct it at an early stage of the proceedings.'" L.B. v. State, 10 So. 3d 1161, 1162 (Fla. 3d DCA 2009) (quoting Harrell, 894 So. 2d at 940).

Here, Kamari did not make the argument in the trial court that he now advances on appeal. While Kamari objected to the jury-selection process itself—stating he wished to see the order in which jurors remained available for challenge—he never asserted the process impeded his ability to exercise peremptory challenges in an informed, effective, or strategic manner at any point before the jury was sworn. He never put the trial court on notice of this argument and accepted the twelve-member panel and two alternates without raising those objections or requesting additional challenges.

Then, after the panel was selected—but before the jury was sworn— he simply stated he was renewing all prior motions and objections. Those objections, however, did not include any assertion that not knowing who comes next somehow impaired his effective exercise of peremptory challenges. Absent such objections, the trial court was entitled to presume that no prejudice occurred and that counsel's ability to exercise peremptory strikes was not impaired. Because Kamari did not precisely assert that the

38

court's jury selection method impeded his ability to exercise peremptory challenges in an informed, effective, or strategic manner before the jury was sworn, he failed to preserve the issue for appellate review.[15]  See Tillman v. State, 471 So. 2d 32, 35 (Fla. 1985) ("In order to be preserved for further review by a higher court, an issue must be presented to the lower court . . . ."); State v. Ivey, 285 So. 3d 281, 286–88 (Fla. 2019) ("It is a basic principle of our law that an objection must be specific to be preserved for review.  Though no magic words are required, the objection must have been sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor. . . . The purpose of this rule . . . is to place the trial judge on notice that error may have been committed, and provide him an opportunity to correct it at an early stage of the proceedings.  A review of the record establishes that the objection here was not properly [] preserved. . . . We hold that what counsel said in that discussion did not do the trick:  his statement to the trial judge lacked the requisite specificity.  If counsel wished to [pursue] an objection . . . [he] needed to make that fact clear. . . . Counsel's

---

[15]  Kamari concedes he does not argue fundamental error on appeal.  See Mansueto v. State, 148 So. 3d 813, 815 (Fla. 4th DCA 2014) ("Issues not properly raised in the lower tribunal are typically waived on appeal save for unpreserved issues that constitute fundamental error."); Collins v. State, 211 So. 3d 214, 215 (Fla. 4th DCA 2017) (holding that a "fundamental error" claim is waived by failing to make that argument on appeal).

statement gives not the slightest hint that he had the objection to the peremptory strike in view. In the absence of any specific indication that counsel was referring to the objection to the peremptory challenge, the trial court could have had no idea that counsel sought to [pursue an objection as to the peremptory strike.]") (internal quotation marks and citations omitted); State v. Johnson, 295 So. 3d 710, 714-16 (Fla. 2020) ("It is the objecting party's obligation to place the trial court on notice of the basis for the challenge and create a record supporting that objection. . . . In this case, Johnson did not make a specific objection . . . . Accordingly, Johnson failed to preserve his challenge to the trial court's [ruling on the peremptory strikes.]") (internal citations omitted); Richemond v. State, 126 So. 3d 281, 284 (Fla. 3d DCA 2011) ("Under the contemporaneous objection rule, an issue is properly preserved if the trial court knows that an objection was made, clearly understands the nature of the objection, and denies that request. Additionally, courts have avoided the necessity of *magic words* when stating an objection as long as counsel articulates the objection with sufficient specificity as to inform the trial judge of the alleged error. We do not believe the[] objections [at issue] apprised the trial court that Richemond was complaining [about the argument he now advances on appeal.] We

therefore conclude that he failed to preserve the issue argued on appeal.")[16] (internal quotation marks and citations omitted).

**VII.**

While Kamari argues the struck jury method is preferrable, it simply does not mean it is exclusively required by law. Where no constitutional provision, statute, rule, binding precedent or historical tradition prevents Florida courts from using the random jury-box method, the trial court did not abuse its discretion in applying it where Kamari cannot point to any harmful prejudice. Paramount to the analysis is the notion that any jury selection method—even previously approved types—may run afoul of constitutional or other concerns if proper objections are made and harmful prejudice has resulted to a party. Here, there is none.

Although concerns may exist that the use of a random jury-box method for jury selection may call into question a defendant's "ability to 'use his peremptory challenges intelligently and effectively,'" that is outside the scope

---

[16] Although Kamari first claimed prejudice in his motion for new trial, an objection to the exercise of peremptory strikes must be raised before the jury is sworn; an issue first presented in a post-trial motion after the jury is sworn is untimely. See Castillo, 486 So. 2d at 565 ("A second issue is whether the objection to the improper use of peremptories must be raised prior to the jury being sworn. The answer is in the affirmative. . . . Clearly, an objection must be raised prior to the swearing of the jury, and the issue being presented for the first time on a [post-trial motion], after the jury is sworn, is not timely.").

41

of our plenary review. Sikes, 415 So. 3d at 241 (Fla. 3d DCA 2025) (Gooden, J., specially concurring) (quoting Tedder v. Video Elecs., Inc., 491 So. 2d 533, 535 (Fla. 1986)). Such questions properly fall within the Florida Supreme Court's rule-making authority. See Off. of Pub. Def. v. State, 714 So. 2d 1083, 1085–86 (Fla. 3d DCA 1998) (SORONDO, J., specially concurring) ("The Florida Supreme Court is authorized to promulgate rules of procedure. . . . Procedural rules concerning the judicial branch are the responsibility of this Court, subject to repeal by the legislature in accordance with our constitutional provisions." (internal citations omitted)).

If the Court deems it appropriate, the adoption of a uniform rule or procedural amendment governing the use of random jury-box method might promote statewide consistency, safeguard the informed and meaningful exercise of peremptory challenges and define the limits of trial court discretion in employing such a method. Such guidance would establish when these procedures are permissible, clarify counsel's ability to make strategic peremptory decisions and provide an orderly mechanism for preserving and reviewing related objections. See TRG Desert Inn Venture, Ltd. v. Berezovsky, 194 So. 3d 516, 520 n.5 (Fla. 3d DCA 2016); E.R. Truck & Equip. Corp. v. Gomont, 300 So. 3d 1230, 1231–32 (Fla. 3d DCA 2020).

On this record, I would affirm the first issue because there is no abuse of discretion in the trial court's application of the random jury box method and I would affirm the second issue for failure to preserve it for appellate review.

For these reasons, I respectfully concur in result.